UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MATTHEW BOROWSKI

                                    Plaintiff,                              23-CV-257

v.

U.S. CUSTOMS AND BORDER PROTECTION

                                    Defendant.

_____


### STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

In support of its motion for partial summary judgment, defendant, U.S. Customs and Border Protection ("CBP"), by its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Mary K. Roach, and Scott Leeson Sroka, Assistant United States Attorneys, of counsel, hereby submits the following Statement of Material Facts as to which there is No Genuine Issue to be Tried:

**A. Customs and Border Protection and the NEXUS Program**

1.      CBP is a component law enforcement agency of DHS with statutory responsibility for safeguarding America's borders and facilitating legitimate trade and travel. CBP is comprised of more than 60,000 employees charged with enforcing hundreds of Federal statutes.  This includes approximately 45,000 armed law enforcement officers—CBP Officers, U.S. Border Patrol Agents, and CBP Air and Marine Agents—engaged in carrying out CBP's expansive border security mission to protect the borders of the United States against terrorists and instruments of terror, enforce customs and immigration, and foster our Nation's economy by facilitating lawful international trade and travel.  Supplemental

Declaration of Patrick A. Howard ("Howard Supp. Dec."), ¶ 60.  The Howard Supplemental Declaration is attached to the Appendix to Statement of Material Facts ("Appx.") filed herewith, as Exhibit 1.

2.      The NEXUS program ("NEXUS") is jointly administered by the United States and Canada and allows pre-approved low-risk travelers expedited processing for travel between the United States and Canada at dedicated processing lanes, at designated northern border ports of entry, at NEXUS kiosks at U.S. preclearance airports in Canada, and at marine reporting locations.  Declaration of Michael J. Millich (Dkt. #7-1) ("Millich Dec."), ¶ 8; 75 Fed. Reg. 82,202, 82,202 (Dec. 29, 2010).  The Millich Declaration is attached to the Appendix to Statement of Material Facts, filed herewith, as Exhibit 2.

3.      NEXUS requires applicants to be approved independently by both CBP and the Canada Border Services Agency.  *Id.,* ¶ 8.

4.      With respect to CBP, applicants apply through CBP's Trusted Traveler Program website.  *Id.* ¶ 9.  CBP then reviews the applicants' information and checks it against various government databases.  *Id.*

5.      Applicants with complete applications that meet the eligibility criteria are notified that they have been conditionally approved and can schedule a personal interview at a CBP Enrollment Center.  *Id.*

6.      The approval for NEXUS membership is contingent on the final decisions regarding the vetting of the application, the submission of fingerprints, and the results of the interview.  *Id.*

7.      The memberships are valid for five years, after which a member must reapply and undergo renewal vetting and may require an interview.  *Id.*

8.     This vetting, like the initial processing, includes checks of various government databases.  *Id.*

9.     In addition, all members are vetted against a set of law enforcement databases on a recurrent basis, which could identify information that may lead to the revocation of membership before the membership expiration date.  Based on the specifics of the application, approvals, denials, and revocations can be carried out at multiple points in the enrollment spectrum.  *Id.*

**B.  Plaintiff's NEXUS Membership**

10.     Plaintiff submitted his initial application for a NEXUS membership on or about November 13, 2011.  *Id., ¶* 17.

11.     Plaintiff's application was approved, and he was enrolled in NEXUS.  *Id.*

12.     Following an inspection in December 2013, Mr. Borowski's membership was revoked on December 16, 2013. *Id.,¶* 18.

13.      Plaintiff sought review by the CBP Ombudsman, who granted discretionary consideration, and his NEXUS membership was restored on or about April 25, 20l4.  *Id.,¶* 19.

14.     Plaintiff applied to renew his membership on or about August 25, 2017, and the application was approved, effective on or about September 17, 2017. *Id.*, ¶ 20.

15.     Plaintiff again applied to renew his membership on or about May 26, 2022.  *Id.*, ¶ 21.

16.     On or about December 20, 2022, CBP provided plaintiff with two letters, one revoking his membership and one denying his membership.  *Id.*  These letters stated that he

does "not meet program eligibility requirements based on the vetting, which included review of information in CBP's law enforcement databases." *Id.*

17.    Plaintiff sought review by the CBP Ombudsman, who, on April 12, 2023, sustained the denial. *Id.*, ¶¶ 23-24.

18.    Plaintiff was provided notice of this decision on April 12, 2023, in a letter stating that "it has been determined that no change is warranted at this time." *Id.,* ¶ 24.

**C.  The Supplemental Declaration of Patrick A. Howard**

19.    Patrick Howard is a Branch Chief within the Freedom of Information Act Division ("FOIA Division") at CBP, U.S. Department of Homeland Security ("DHS").  He has been a Branch Chief in the FOIA Division since February 8, 2015.  In this capacity, he oversees a staff of Government Information Specialists involved in the processing of requests for records submitted to CBP pursuant to Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; the Privacy Act ("PA"), 5 U.S.C. § 552a; and other activities conducted pursuant to applicable records access provisions. Howard Supp. Dec., ¶ 1.

20.    Mr. Howard is familiar with CBP's procedures for responding to FOIA requests.  He provides technical and administrative supervision to a group of FOIA specialists in processing FOIA requests, and he assists with FOIA and PA litigation matters. He is personally familiar with the processing of FOIA and PA responses, including, at times, by directly reviewing them for adequacy and compliance with federal laws and regulations. *Id.,* ¶ 2.

21.    The statements he made in the Supplemental Declaration were based upon his personal knowledge, which includes knowledge acquired through information furnished

to him in the course of his official duties and CBP files that he personally reviewed in the course of his official duties. *Id.,* ¶ 3.

22.     He is familiar with the FOIA request submitted to CBP on December 22, 2022, by Plaintiff Matthew Borowski. *Id.,* ¶ 4.

23.     The Howard Supplemental Declaration describes CBP's handling of Plaintiff's FOIA request relating to above-captioned matter.  *Id.,* ¶ 5.

**D. <u>CBP Background and Process for Responding to FOIA Requests</u>**

24.     The FOIA Division at CBP reviews FOIA requests, determines whether responsive records exist and, if so, whether they can be released in accordance with the FOIA.  In processing such requests, the FOIA Division consults with CBP personnel and, when appropriate, with other components in DHS, as well as other Executive Branch agencies.  *Id.,* ¶ 7.

25.     Generally, when CBP receives a FOIA request that reasonably describes the records requested and complies with CBP's rules governing the procedures for FOIA requests, CBP initially must search for, and retrieve, potentially responsive records. *Id.,* ¶ 8.

26.     Once CBP has completed its search and located potentially responsive records, it must process those records for release.  Processing records requires reviewing records for responsiveness to the request, and reviewing responsive records to excise and withhold information that falls within any one of the FOIA's nine statutory exemptions from disclosure set forth at 5 U.S.C. § 552(b). *Id.,* ¶ 9.

27.     To review responsive records for information exempt from disclosure, a CBP FOIA processor must (1) meticulously examine, line-by-line, each responsive page to

identify potential redactions; (2) apply redactions, if necessary; and (3) individually label

each redaction with the applicable exemption or exemptions. *Id.,* ¶ 10.

## Plaintiff's FOIA Request

28.     On December 22, 2022, CBP received a request from Plaintiff under FOIA

seeking the following information:

> All documents, records, information, database entries, or any other
> electronically stored information (ESI), papers, notes, documents pertaining
> to the trusted Traveler Program application(s), renewals, revocations, denials,
> for MATTHEW BOROWSKI with NEXUS Program Membership
> #982419666, relating to the denial/revocation dated December 20, 2022
> including reason(s) for denial.  I also request any and all notes, document,
> derogatory information, information about any purported violations, and/or
> entries in CBP Databases that were consulted or used as a basis for the denial.

*Id.,* ¶ 11.

## CBP's Search for Records

29.     Upon receiving Plaintiff's FOIA request, the CBP FOIA Division staff

considered which CBP databases were likely to hold responsive information based upon a

careful review of the content of the request itself and the nature of the records sought.  *Id.,* ¶

12.

30.     The FOIA Division determined that responsive records pertaining to

Plaintiff's request for records or information relating to the applications, renewals, denial

and revocation of Plaintiff's NEXUS membership on December 20, 2022, would be located

in the Global Enrollment System ("GES") database, and that responsive records relating to

Plaintiff's request for records that were consulted as part of the decision to deny and revoke

Plaintiff's NEXUS membership would be located in the Analytical Framework for

Intelligence ("AFI") system.  No other record systems were likely to produce additional

responsive records, as detailed below in paragraphs 31 to 51, *infra*. Howard Supp. Dec., ¶ 13.

## GES

31.     GES consolidates records relating to the enrollment of, and vetting processes for, individuals seeking to participate in CBP's trusted traveler programs, including the NEXUS program.  GES is the sole repository for trusted traveler program enrollment, application, and background investigation data.  Records relating to CBP's assessment of a particular individual's eligibility and application processing are contained within the GES system.  *Id.,* ¶ 14.

32.     All individuals accepted into the NEXUS program receive a membership identification card and membership number specific to that individual.  That membership number is reflected in the GES records for that particular individual. *Id.,* ¶ 15.

33.     As to the search terms utilized, the FOIA Division searched GES using Plaintiff's NEXUS membership number.  *Id.*, ¶ 16.

34.     Using Plaintiff's NEXUS membership number allowed retrieval of all trusted traveler records relating to Plaintiff's NEXUS membership, including those records relating to Plaintiff's NEXUS membership denial/revocation dated December 20, 2022, as requested by Plaintiff in his FOIA request.  *Id.*

35.     Consequently, searching GES using Plaintiff's first and last name would be unlikely to uncover additional, relevant records responsive to that portion of Plaintiff's request for records. *Id.*

36.     Thus, a search of GES utilizing Plaintiff's NEXUS membership number was reasonably designed to produce all records responsive to Plaintiff's request seeking

Plaintiff's Trusted Traveler records, specifically those relating to the denial/revocation of Plaintiff's NEXUS membership on December 20, 2022. *Id.,* ¶ 17.

## AFI

37.     The records that formed the basis of the December 2022 denial of Plaintiff's NEXUS membership included Plaintiff's trusted traveler records, found in GES, discussed above, as well as CBP border inspection records, which are found in AFI system. *Id.,* ¶ 18.

38.     CBP's AFI system incorporates and indexes data from several other CBP and DHS source data systems, including: Automated Targeting System (ATS); Advance Passenger Information System (APIS); Electronic System for Travel Authorization (ESTA); Border Crossing Information (BCI); TECS; Nonimmigrant and Immigrant Information System (NIIS); Seized Asset Case Tracking System (SEACATS); Department of Justice (DOJ) Federal Bureau of Investigation (FBI) Terrorist Screening Database; GES; and Enterprise Management Information System-Enterprise Data Warehouse (EMIS-EDW). *Id.,* ¶ 19.

39.     For example, and as relevant here, CBP currently uses transaction-based systems such as TECS (not an acronym) to input, access, or maintain law enforcement, inspection, intelligence-gathering, and operational records.  *Id.,* ¶ 20.

40.     TECS serves as the data repository for border screening and reporting for CBP's primary and secondary inspection processes, including the enforcement or inspection records pertaining to individuals. *Id.,* ¶ 21.

41.     All travelers entering the United States must undergo DHS customs and immigration inspection to ensure that they are legally eligible to enter and that their belongings are not being introduced into the United States contrary to law.  It is not until

those processes are complete that a traveler, with or without his/her belongings, is permitted to enter the United States.  Depending on the method of conveyance used to travel to the United States (*e.g.*, air, sea, or land (pedestrian and vehicle)), CBP collects certain information from, and about, the traveling public at various stages of the international trip. *Id.,* ¶ 22.

42.     Unlike for those arriving by air or sea, CBP generally does not receive information about individuals traveling to the U.S. by foot (pedestrian) or vehicle prior to their arrival at a Port of Entry.  Vehicles are presented to CBP at the vehicle primary border crossing lanes upon arrival at a land Port of Entry.  At vehicle primary, the CBP officer obtains information directly from the driver and traveler(s) within the vehicle via their travel documents (e.g., passport), through verbal communication, or both.  During CBP's primary and secondary inspection processes, CBP will collect a traveler's complete name (last name, first name, and middle name or initial).  *Id.,* ¶ 23.

43.     The information collected at vehicle primary is used to query TECS to assist the CBP officer in determining the admissibility of the person(s) and otherwise inform the CBP officer charged with enforcing other U.S. laws at the border.  If the CBP officer at primary determines that further examination is appropriate, then the vehicle and all of its occupants will be referred to vehicle secondary for processing.  During a vehicle secondary inspection, a CBP officer may run law enforcement queries through TECS.  A record of the inspection is entered into TECS.  *Id.,* ¶ 24.

44.     AFI then ingests and consolidates the information from the TECS system, as well as the other source systems mentioned above, such that searching AFI is inclusive of searching those records ingested from TECS and other source systems.  The data in AFI has

been indexed in a way that allows searches for a particular individual across all information in a record. Inspection records contained within AFI as incorporated from CBP's source systems, including TECS, contain a traveler's complete name as provided via their travel documents and/or through verbal communication during the inspection process. *Id.*, ¶ 25.

45.     The FOIA Division searched AFI using Plaintiff's first and last name in conjunction with one another, "Matthew Borowski," as provided within Plaintiff's FOIA request. *Id.*, ¶ 26.

46.     Because inspection records contain a traveler's complete name, a search utilizing Plaintiff's first and last name in conjunction with one another was reasonably designed to produce all records responsive to Plaintiff's request for records that were consulted as part of the decision to deny and revoke Plaintiff's NEXUS membership. *Id.*

47.     Searching Plaintiff's first and last names separately would be unlikely to uncover additional records responsive to Plaintiff's request, and conversely, would be reasonably likely to produce voluminous records non-responsive to Plaintiff's request. *Id.*

48.     A search for inspection records in AFI utilizing Plaintiff's NEXUS membership number would be unlikely to uncover additional, relevant records responsive to the portion of Plaintiff's FOIA request seeking records consulted or used as a basis for denial of Plaintiff's December 2022 NEXUS membership. *Id.*, ¶ 27.

49.     Based on Mr. Howard's experience in the FOIA Division, he stated that by searching the GES and AFI systems, FOIA searched all files likely to contain records or information responsive to Plaintiff's request. *Id.*, ¶ 28.

50.     No other custodians were likely to possess additional responsive records. *Id.*, ¶ 29.

51.     Any further search would be unlikely to uncover additional, relevant records responsive to Plaintiff's request. *Id.,* ¶ 30.

52.     The FOIA Division's search yielded 251 pages of responsive records. *Id.,* ¶ 31.

53.     The responsive records were compiled for CBP's law enforcement purposes in that they were created and used by CBP in its law enforcement mission to secure the international borders of the United States.  This includes records relating to Plaintiff's encounters with CBP personnel at ports of entry, and relating to his participation in CBP's NEXUS program, which directly relates to CBP's law enforcement activities and border security purposes. *Id.,* ¶ 32.

54.     The responsive records were processed by personnel from the FOIA Division in the manner described above.  On May 25, 2023, CBP released 251 pages of records responsive to Plaintiff's request. *Id.,* ¶ 33.

55.     CBP re-processed and, on July 2, 2024 re-released, all 251 pages to Plaintiff, with fewer redactions on three (3) records.  *Id.*, ¶ 34.

56.     Specifically, CBP un-redacted portions of the intra-agency emails (pages 000019-000023 of the FOIA release), with the remaining FOIA-exempt information redacted as delineated below and in the *Vaughn* Index, filed herewith.  *Id.*

57.     CBP also un-redacted the license plate numbers contained within the inspection narratives from Plaintiff's border inspections on March 19, 2013 (page 000028 of the FOIA release) and December 14, 2013 (pages 000031-000032 of the FOIA release), with the remaining FOIA-exempt information redacted as delineated below and in the *Vaughn* Index, filed herewith.  *Id.*

**CBP's Determination Regarding Segregability**

58.     In responding to Plaintiffs' requests, the FOIA Division reviewed each record

page by page and line-by-line to confirm that any withholdings were proper and determine

whether any segregable, non-exempt information could further be released.  CBP did not

withhold non-exempt information. *Id.,* ¶ 35.

**CBP's Application of FOIA Exemptions**

59.     CBP withheld information pursuant to FOIA exemptions 5 U.S.C. §§

552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(E) on the records provided to Plaintiff.  These

withholdings are described below, and in the *Vaughn* Index, which is attached to the

Appendix as Exhibit 3.  *Id.*, ¶ 36.

**Summary of Exemption Categories**

60.     The *Vaughn* Index includes a Summary of Exemption Categories

("Summary").  The Summary includes subcategories as to the exemptions asserted under 5

U.S.C. 552(b)(6), (b)(7)(C) and (b)(7)(E).  *See, Vaughn* Index, Appx., Ex. 3, pp. 1-6.

61.     In the Summary, each withholding is accompanied by a coded designation

that corresponds to the exemption categories as listed in this chart.  For example, "(b)(7)(E)-

1" refers to FOIA Exemption 7(E), and the numerical designation of "1" following the

"(b)(7)(E)" narrows the main category into the more specific subcategory, as indicated in the

chart below.  *See, Vaughn* Index, p. 3.  These exemptions are also discussed more fully below.

Howard Supp. Dec.*,* ¶ 36.

**FOIA Exemption (b)(5)**

62.     FOIA Exemption (b)(5) exempts from disclosure "intra-agency

memorandums or letters that would not be available by law to a party other than an agency

in litigation with the agency." 5 U.S.C. § 552(b)(5).  This exemption incorporates the deliberative-process privilege. *Id.*, ¶ 37.

63.     Consistent with the rationale underlying the deliberative-process privilege, Exemption (b)(5) applies to predecisional, deliberative records. *Id.*, ¶ 38.

64.     CBP applied Exemption (b)(5) to information subject to the deliberative-process privilege. *Id.*, ¶ 39.

65.     As identified in the *Vaughn* Index at page 7, CBP applied Exemption (b)(5) to five pages of records, consisting of intra-agency emails (pages 000019-000023 of the FOIA release). *Id.*

66.     Those five pages of records constitute internal predecisional deliberations and recommendations of CBP employees pertaining to Plaintiff's NEXUS eligibility, and they predate CBP's 2014 decision regarding Plaintiff's NEXUS eligibility. *Id.*

67.     In addition to being exempt under (b)(5), these five pages of records also contain information that is further exempt from disclosure under Exemptions (b)(6), (b)(7)(C), and (b)(7)(E), which is discussed below. *Id.*

68.     Specifically, the intra-agency emails consist of seven (7) emails sent on April 2, 2014, April 4, 2014, April 17, 2014, April 18, 2014, and April 22, 2014.  The authors of the emails, who were also recipients of the emails, were individuals occupying CBP positions who informed the decision whether to approve or deny Plaintiff's NEXUS membership reinstatement in April 2014.  Those individuals included an Ombudsman for CBP's Trusted Traveler Programs; two (2) Border Security managers in the Boston and Buffalo Field Offices, respectively; an Assistant Port Director within the Port of Buffalo;

and a Supervisory CBP Officer. The Ombudsman was the decision-maker relating to Plaintiff's NEXUS membership reinstatement on April 25, 2014. *Id.*, ¶ 40.

69.     The email deliberations to which FOIA Exemption (b)(5) was applied concerned the reinstatement of Plaintiff's NEXUS membership. *Id.*, ¶ 41.

70.     The content of the redacted portions of the emails includes deliberations, the expression of opinions, and recommendations as to whether Plaintiff's NEXUS program history and compliance with CBP's border inspectional process supports a reinstatement of Plaintiff's trusted traveler status. *Id.*

71.     These opinions and recommendations were prepared for the purpose of assisting, and considered as part of, the Ombudsman's decision ultimately approving the reinstatement of Plaintiff's membership in the NEXUS program on April 25, 2014. *Id.*

72.     The withheld information does not reflect CBP's final determination of Plaintiff's NEXUS membership reinstatement. *Id.*, ¶ 42.

73.     As was the case here, determination as to whether a particular individual is eligible to participate in the NEXUS program may include intra-agency deliberation to inform the decision-maker ultimately tasked with determining whether an applicant can satisfy CBP of his or her low-risk status or meet other program requirements. *Id.*, ¶ 43.

74.     Disclosure of this information would create a chilling effect that would harm internal Agency open discourse, and could create public confusion in releasing non-finalized, pre-decisional records. Further, release of the predecisional records containing intra-agency deliberations concerning a NEXUS eligibility determination would reasonably be expected to impede the open and candid expression of recommendations and opinions necessary to making such a determination. *Id.*, ¶ 44.

## FOIA Exemption (b)(7)(E)

75.     FOIA Exemption (b)(7)(E) exempts from disclosure "records or information complied for law enforcement purposes" that, if released "would disclose techniques and procedures for law enforcement investigations or prosecutions" or "would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  This exemption covers law enforcement "techniques and procedures" not generally known to the public, and it covers law enforcement "guidelines" if disclosure of those guidelines "could reasonably be expected to risk circumvention of the law." *Id.,* ¶ 45.

76.     CBP is constrained in describing the techniques, procedures, and guidelines withheld under Exemption (b)(7)(E) so as to avoid revealing the very information CBP seeks to protect.  *Id.,* ¶ 46.

77.     As delineated within the *Vaughn* Index, CBP applied Exemption (b)(7)(E) to withhold seven types of information in records that were compiled for law enforcement purposes.  *Id.*, ¶ 47.

78.     The Summary includes subcategories (b)(7)(E)-1 to (b)(7)(E)-7 as to the exemptions asserted under (b)(7)(E).  *See, Vaughn* Index, Appx., Ex. 3, pp. 3-6; ¶¶ 80-93, *infra.;* Supp. Howard Dec., ¶ 47.

79.     As discussed below, these seven subcategories generally fall into one of two groups: (1) information relating to CBP systems and databases; and (2) information relating to law enforcement techniques and procedures utilized in furtherance of CBP's mission in securing the United States border and facilitating lawful trade and travel. Supp. Howard Dec., ¶ 47.

***Information relating to CBP systems and databases.***

80.     CBP withheld information relating to CBP systems and databases because disclosure of this information could be used to locate, access, and navigate internal law enforcement computer systems and databases, and could allow manipulation or deletion of data and/or interfere with enforcement proceedings. *Id.,* ¶ 48.

81.     Specifically, CBP withheld non-public law enforcement system and database information, functionalities, and capabilities, including how a database is utilized in the execution of CBP's law enforcement mission.  These materials are designated as subcategory (b)(7)(E)-1 in the *Vaughn* Index, filed herewith.  *Id.,* ¶ 49.

82.     CBP also withheld non-public, law enforcement sensitive CBP codes, numbers, and identifiers utilized in CBP law enforcement systems and databases.  These materials are designated as subcategory (b)(7)(E)-2 in the *Vaughn* Index.  *Id.,* ¶ 50.

83.     Disclosure of such law enforcement techniques and procedures would be debilitating and detrimental to both CBP and the law enforcement community.  Disclosure of the type of information designated as (b)(7)(E)-1 and (b)(7)(E)-2, either standing alone or in combination with other information, presents a risk that CBP systems could be compromised or, in the event that such systems were compromised, that they could be more effectively navigated and exploited to promote circumvention of the law by gaining access to law enforcement sensitive information, detrimental to CBP's mission in securing the U.S. border and facilitating lawful travel and trade. *Id.,* ¶ 51.

84.     This information is not generally known by the public.  *Id.,* ¶ 52.

*Information relating to law enforcement techniques and procedures utilized in furtherance of*

*CBP's mission in securing the United States border and facilitating lawful trade and travel.*

85.   CBP withheld information relating to border inspection techniques and procedures utilized in inspecting, and assessing law enforcement risks associated with, travelers crossing the United States border.  These materials are designated as subcategory (b)(7)(E)-3 in the *Vaughn* Index. *Id.,* ¶ 53.

86.   CBP withheld information relating to the criteria used by CBP to determine which travelers require additional border inspection.  These materials are designated as subcategory (b)(7)(E)-4 in the *Vaughn* Index. *Id.,* ¶ 54.

87.   CBP withheld information relating to the methods for processing and querying records in law enforcement systems and databases utilized in inspecting, and assessing risk presented by, a particular traveler, including how information in those systems and databases is accessed, searched, and documented, and the results of such queries. These materials are designated as subcategory (b)(7)(E)-5 in the *Vaughn* Index. *Id.,* ¶ 55.

88.   CBP withheld information pertaining to investigative conclusions and determinations compiled for law enforcement purposes.  These materials are designated as subcategory (b)(7)(E)-6 in the *Vaughn* Index. *Id.,* ¶ 56.

89.   CBP also withheld non-public, intra-agency contact information, such as internal phone numbers or email addresses.  These materials are designated as subcategory (b)(7)(E)-7 in the *Vaughn* Index. *Id.,* ¶ 57.

90.   This withheld information is not generally known by the public. *Id.,* ¶ 58.

91.   Disclosure of this information would be detrimental to both CBP and the law enforcement community.  Disclosure of the information, designated as (b)(7)(E)-3 through

(b)(7)(E)-7 in the *Vaughn* Index, would reveal law enforcement sensitive techniques utilized in securing the U.S. border and in facilitating lawful trade and travel, thereby corrupting the integrity of law enforcement and other screening activities at the border. *Id.*, ¶ 59.

92.     Such information could be used by individuals attempting to circumvent or violate immigration and customs laws to alter patterns of conduct, predict CBP's investigative strategy, adopt new methods of operation to conceal criminal activity, and develop countermeasures to thwart the effectiveness of CBP's law enforcement efforts. Disclosure could also threaten efforts to foster open communication across agencies and cohesive law enforcement and national security efforts, and it could have far-reaching effects, impairing other agencies' law enforcement operations or their ability to effectively carry out their respective missions. *Id.*

93.     Further, disclosure of such information could provide the public with potential targets or means to disrupt internal CBP communications and presents a risk that CBP systems could be compromised and exploited.  Disclosure would also reveal the types of investigative information CBP collects, analyzes, and maintains, detrimental to CBP's mission in securing the U.S. border and facilitating lawful travel and trade. *Id.*, ¶ 60.

### FOIA Exemptions (b)(6) and (b)(7)(C)

94.     FOIA Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  This protection is afforded to information that would infringe on the personal privacy of individuals about whom it pertains and involves a balancing of the public's right to know the information against the individual's right to privacy. *Id.*, ¶ 61.

95.    FOIA Exemption (b)(7)(C) exempts from disclosure records or information compiled for law enforcement purposes, which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(5).  This exemption protects, among other information, the identity of law enforcement personnel and third parties referenced in files compiled for law enforcement purposes.  The exemption applies where the privacy interest in the identity of an individual outweighs any public interest in disclosure of that information. *Id.,* ¶ 62.

96.    As delineated within the *Vaughn* Index, CBP applied Exemptions (b)(6) and (b)(7)(C) in tandem to records, which were compiled for law enforcement purposes, such that information in those records protected by one exemption is also protected by the other. *Id.*, ¶ 63.

97.    The Summary includes subcategories (b)(6), (b)(7)(C)-1, (b)(6), (b)(7)(C)-2, and (b)(6), (b)(7)(C)-3 as to the exemptions asserted under (b)(6) and (b)(7)(C).  *See, Vaughn* Index, pp. 2-3; ¶¶ 98-108, *infra.;* Supp. Howard Dec.*,* ¶ 63.

98.    CBP withheld the names of CBP employees.  These materials are designated as subcategory (b)(6), (b)(7)(C)-1 in the *Vaughn* Index, filed herewith. Supp. Howard Dec.*,* ¶ 64.

99.    The withheld information includes the names of CBP personnel within CBP's Trusted Traveler Program and those personnel involved in assessing and determining Plaintiff's NEXUS eligibility (*see Vaughn* Index, Exhibit A; FOIA release pp. 000001-000008; 000019-000023), and the names of CBP officers involved in the border inspection process (*see Vaughn* Index, FOIA release pp. 000028-000199). *Id.*

100.    CBP also withheld unique personally identifying information of CBP personnel. *Id.*, ¶ 65.

101.    These materials are designated as subcategory (b)(6), (b)(7)(C)-2 in the *Vaughn* Index, filed herewith. *Id.*

102.    The withheld information includes the user identification codes of CBP employees within CBP's Trusted Traveler Program (*see Vaughn* Index; FOIA release pp. 000005-000007, 000010, 000012, 000013, 000016, 000017, 000026), and the computer workspace identification numbers assigned to individual CBP employees involved in the border inspection process (*see Vaughn* Index, FOIA release pp. 000058-000105, 000108-000199). *Id.*

103.    For each withholding, the CBP employee has a protectable privacy interest in the nondisclosure of their identity or other identifying information.  Because CBP employees occupy sensitive, law enforcement positions, they face an increased risk of becoming the targets of harassment or attack.  Withholding this information protects CBP employees from harassment in their private lives due to the conduct of their official duties, which could result from public disclosure of their identity.  *Id.*, ¶ 66.

104.    Additionally, releasing the names of such employees would not meaningfully increase the public understanding of government operations, justifying such disclosure.  Thus, release of such information would constitute an unwarranted invasion of personal privacy that outweighs the public interest in disclosure of such information. *Id.*

105.    CBP also applied these exemptions to withhold the names of non-employee third parties, as well as information by which those individuals could be identified.  These materials are designated as subcategory (b)(6), (b)(7)(C)-3 in the *Vaughn* Index. *Id.,* ¶ 67.

106.    Third parties maintain significant personal privacy interests in not having their identifying information disclosed in the context of government records, as such release could subject those parties to harassment, undue public attention, speculation, and stigmatizing connotation associated with being identified in a law enforcement record.  *Id.*, ¶ 68.

107.    Further, releasing such names or identifying information would not meaningfully increase the public understanding of government operations, justifying such disclosure.  Thus, release of such information would constitute an unwarranted invasion of personal privacy that outweighs the public interest in disclosure of such information. *Id.*

108.    None of the CBP employees or third parties whose personal information was withheld provided authorization to release their personal information. *Id.*, ¶ 69.

Dated:  July 9, 2024.

Respectfully Submitted,

TRINI E. ROSS
United States Attorney


BY:    S/MARY K. ROACH
       S/SCOTT LEESON SROKA
       Assistant United States Attorneys
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       (716) 843-5866
       mary.k.roach@usdoj.gov
       scott.sroka@usdoj.gov