UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MATTHEW BOROWSKI

Plaintiff, 1:23-CV-257-EAW

v.

U.S. CUSTOMS AND BORDER PROTECTION

Defendant.

---

## INTRODUCTION

This Memorandum of Law is submitted on behalf of Defendant U.S. Customs and Border Protection ("CBP") in support of its position that Plaintiff Matthew Borowski's ("Borowski") sole remaining claim in this case, under the Administrative Procedure Act ("APA"), should be resolved by way of dispositive motion practice rather than a trial.

## STATEMENT OF FACTS

**Background**

Borowski, an attorney representing himself in this action, is a U.S. citizen who practices immigration law in the Buffalo area. Dkt. # 9, ¶ 6. He claims that he has engaged in political speech criticizing the federal government's immigration policies. Dkt. # 9, ¶ 6. As part of his law practice, Borowski represents non-U.S. citizens in immigration court and federal court. Dkt. # 9, ¶ 6. He is a licensed attorney in New York and Canada. Dkt. # 1, ¶ 76. Borowski alleges that he has clean criminal and driving records and has not violated customs laws or regulations. Dkt. # 9, ¶ 76.

**The NEXUS Program**

The NEXUS program is jointly administered by the United States and Canada and allows pre-approved, low-risk travelers expedited processing when traveling between the two countries. Dkt. # 19-1, ¶ 1; Dkt. # 86-1, ¶ 6. CBP and the Canada Border Services Agency must both approve applicants for the program. Dkt. # 19-1, ¶ 2. CBP reviews an individual's application and checks it against various government databases, and applicants who meet the eligibility criteria can schedule an interview at a CBP Enrollment Center. Dkt. # 19-1, ¶¶ 3-4; Dkt. # 86-1, ¶¶ 7-8. Approval for NEXUS membership is contingent on CBP's vetting of the application, fingerprint submission, and the interview results. Dkt. # 19-1, ¶ 5; Dkt. # 86-1, ¶¶ 7-8. NEXUS membership is valid for five years, after which a member must apply for renewal, which includes checks of government databases, vetting, and may require an interview. Dkt. # 19-1, ¶¶ 6-7. CBP also vets program members on a recurring basis by checking law enforcement databases and may revoke an individual's enrollment before the membership period has concluded. Dkt. # 19-1, ¶ 9; Dkt. # 86-1, ¶ 9. Additionally, while CBP Officers are generally able to spend less time inspecting NEXUS members, relative to travelers who do not have NEXUS membership, NEXUS members are still subject to inspection when seeking entry into the United States and they must comply with all inspection requirements, including answering all routine inspectional questions, as well as any others asked of the inspecting CBP Officer. Dkt. # 86-1, ¶ 10.

**Borowski Obtained His NEXUS Pass in 2012**

Borowski alleges that he regularly commutes between his home in Canada and his law office in Cheektowaga, New York. Dkt. # 9, ¶¶ 7, 9. Because of this, Borowski obtained membership in the NEXUS program to expedite his border crossings by using dedicated lanes

at ports of entry. Dkt. # 9, ¶¶ 7, 9. Borowski applied for the NEXUS program membership on or about November 13, 2011, and CBP approved his application on or about January 3, 2012. Dkt. # 19-1, ¶¶ 9-10; Dkt. # 86-1, ¶ 11.

Borowski alleges that he used his NEXUS card "the vast majority of the time" to cross the border since he was approved for the NEXUS program in approximately 2012 and began his law practice in the Buffalo area in 2013. Dkt. # 9, ¶¶ 8-9. Borowski claims that he relied on his NEXUS membership to routinely travel across the border for over ten years. Dkt. # 9, ¶¶ 8-9.

**March 2013 to December 2013: Borowski Repeatedly Engaged in Confrontational Behavior with CBP Officers at the Border**

On March 19, 2013,

> During a primary K-9 inspection of the vehicle, BOROWSKI became argumentative about the K-9 exam. BOROWSKI was referred to secondary to continue the inspection. When BOROWSKI arrived to the secondary parking lot, he was [met] by [a CBP Officer who] instruct[ed] BOROWSKI to park when BOROWSKI became even more argumentative and irate about the inspection and refused to get off his cellphone after being asked three times. At that time, [CBP Officer] radioed for assistance. When additional officers arrived, BOROWSKI became compliant and was asked to exit the vehicle. BOROWSKI was escorted to the secured secondary area.
>
> …
>
> Chief Notes: When speaking with Mr. Borowski on 3/19/2013, I reviewed NEXUS program and NEXUS lane procedures and violations to include that NEXUS card holders are subject to inspection. I explained that committing NEXUS violations, including failing to comply with any part of the inspection process, could result in revocation of NEXUS status. During our discussion Mr. Borowski was courteous and apologetic, at no time did he make derogatory comments about the officers and stated they were professional at all times during his inspection. At the conclusion of our conversation, Mr. Borowski thanked me

> for taking the time to review the NEXUS process with him. Prior to Mr. Borowski's release, I confirmed with secondary officers that they had completed the inspection and Mr. Borowski was released as a US citizen.

Appendix A, p. 59[1]; see also Appendix A, pp. 52-58.

On April 18, 2013

> an Ontario plated vehicle was encountered in the outbound lane at the Peace Bridge Port of entry in Buffalo New York. The vehicle contained BOROWSKI, Matthew …. The subject was asked by the primary outbound Officer where he was coming from to which Mr. Borowski answered "Im a United States Citizen." The primary Officer again asked where are you coming from to which Mr. Borowski then answered "A meeting[.]" The primary outbound Officer asked Mr. Borowski to open his trunk, Mr. Borowski asked "Under what authority?" The primary Officer then asked Mr. Borowski to pull over to the secondary inspection area where he would explain under what authority CBP could inspect his vehicle. Mr. Borowski began to pull over and stopped, blocking both lanes of traffic and began yelling out his window that he wished to withdraw his application for admission. (Mr. Borowski was outbound so we still don't know application for admission to what.) While turning to pull over Mr. Borowski then stopped his vehicle, he was asked and then told to drive to the secondary inspection area. Only after several verbal commands to pull to the secondary inspection area did Mr. Borowski comply. When in the secondary inspection area Mr. Borowski continually stated that he was a U.S. citizen and under what authority did CBP have to inspect his vehicle. Mr. Borowski was told that CBP had the authority to inspect both inbound and outbound traffic. Mr. Borowski was asked and then told several times to exit his vehicle so the inspection could be completed. Only after [CBP Officer] physically opened the door and guided Mr. Borowski out of the vehicle did he finally comply. During questioning it was discovered that Mr. Borowski had recently taken the Bar exam and that he was planning on becoming a lawyer. Mr. Borowski stated that he knew CBP could inspect inbound vehicles but did not think that they could inspect outbound vehicles. Mr. Borowski continued to question the authority of CBP for outbound inspections during the entire inspection. Attempts were made to explain the authority of CBP

[1] The Amended Administrative Record was e-filed by CBP at Docket # 45 on July 18, 2024. CBP attaches the Amended Administrative Record hereto as Appendix A for ease of reference.

> by several different Officers. A[n] … exam of the vehicle yielded negative results. Once the inspection was complete, Mr. Borowski[']s Nexus card was returned to him and he was released to travel north to Canada.

Appendix A, p. 51; see also Appendix A, pp. 49-50.

On December 14, 2013,

> at approximately 1810 hours while conducting outbound operations at the Peace Bridge POE in Buffalo, NY an Ontario plated vehicle (ON/BNYL352) was stopped for an inspection. The driver of the vehicle later identified as BOROWSKI, Matthew … was immediately confrontational with the inspecting officer when asked for the registration of the vehicle. The subject replied "for what, what is your probable cause?" in which BOROWSKI was instructed by the Officer that probable cause was not required and the document was requested for verification purposes. BOROWSKI then stated that "you are not Police Officers and just a Border Guard with very little authority at best" in which he recited some reference to law & statutes. The subject was being uncooperative, confrontational and failed to produce his registration in a timely matter.
>
> …
>
> BOROWSKI throughout the inspection was loud, argumentative and provoking, insisting he was a lawyer and attempting to recite his interpretation of Federal law. Due to today's incident, BOROWSKI's prior confrontational encounters, the subjects NEXUS card was detained and forwarded to the NEXUS enrollment office for review.

Appendix A, p. 47; see also Appendix A, pp. 45-46, 48; Borowski v. Mordino, No. 116CV999LJVMJR, 2020 WL 6084941, at *2 (W.D.N.Y. July 21, 2020), report and recommendation adopted, No. 16-CV-00999-LJV-MJR, 2020 WL 6083425 (W.D.N.Y. Oct. 15, 2020).

**December 2013: CBP Revoked Borowski's NEXUS Pass Following The Above Confrontational Incidents**

On December 16, 2013, Borowski's "Nexus card was retained and revoked after third encounter with CBP officers …. Subject has been argumentative and consistently fails to

comply with officer's direction. Subject came to the enrollment center to demand his card be returned. Subject was confrontational and argumentative with the E.C. supervisor and attempted to cause a disturbance in the waiting area. The revocation of the Nexus card was discussed with Chief CBPO … and he concurred with all actions taken." Appendix A, p. 69.

The officer at the enrollment center completed his own report of the December 16, 2013 incident: "Subject came to the Ft. Erie E.C. and became argumentative with the SCBPO demanding a writ of mandamus and First Amendment protections. Subject was advised his NEXUS privileges have been revoked and he was provided with contact information for the Ombudsman per Chief." Appendix A, p. 72.

**April 2014: CBP Ombudsman Reinstated Borowski's NEXUS Pass**

On April 25, 2014, Borowski's NEXUS pass was reinstated by the CBP Ombudsman: "OMBUDSMAN REVIEWED, REINSTATEMENT REASONS: Discretionary consideration granted for applicant's reinstatement in Nexus. E.C. Please warn applicant against future non compliance during both outbound or inbound inspections." Appendix A, p. 69.

**November 2104 to May 2016: Additional Confrontational Incidents at the Border**

On November 3, 2014,

> While … at the Peace Bridge, I encountered BOROWSKI, Matthew. He was referred to door 2 for a … Exam. While his vehicle was being inspected …, BOROWSKI exited out of door 2. I asked BOROWSKI if he was finished with his inspection and he told me that he was not and that he wanted to watch CBPO … while he was inspecting his vehicle. I requested BOROWSKI to return to the building until his inspection was complete. BOROWSKI stated that he wanted to stay outside and watch the inspection. I stated to BOROWSKI that he was unable to watch the inspection of his vehicle and to return into door 2, and he still did not comply. At this time, I placed my hand on his arm and securely escorted him into the CBP secure area located in door

> 2. BOROWSKI became compliant and proceeded to door 2 without incident. BOROWSKI requested to speak to a Supervisor. SCBPO … was apprised of the situation and responded to BOROWSKI's request. SCBPO … explained that he is not
> released from the inspection until all CBP concerns are satisfied.

Appendix A, p. 38; see also Appendix A, pp. 34-39.

On May 22, 2016,

> CBPO … conducting primary inspections in Auto Lane 7 at the Peace Bridge in Buffalo, NY. At 1550hrs, CBPO … encountered a vehicle bearing Ontario License Plate# BNYL678 driven BOROWSKI, Matthew. … He was accompanied by his children, … and his wife. Mr. Borowski presented Nexus Cards as identification for all four passengers. CBPO … asked Mr. Borowski his citizenship, he replied, "We are all United States citizens." CBPO … then attempted to obtain a binding verbal declaration of citizenship from [his wife] by looking directly at her and asking her citizenship. Mr. Borowski raised his voice and quickly responded, "We are all U.S. citizens." CBPO … advised Mr. Borowski each adult in the vehicle needs to give their own verbal declaration of Citizenship. Mr. Borowski raised his voice and argued that he could speak for everyone. He stated, "Yes I can, I'm an Immigration lawyer and I can answer for her." Once again CBPO … asked her what her citizenship was and Mr. Borowski tried to answer for her again, but this time [she] answered, "U.S." After obtaining a verbal declaration of citizenship from both adults in the vehicle, the inspection continued in regards to the purpose of their travel, and if the subjects had anything to declare in terms of goods coming into the U.S. Each time CBPO … asked a question, Mr. Borowski reminded CBPO … that he was an Immigration lawyer. Mr. Borowski was visible aggravated and stated that since they were NEXUS card holders, they didn't need to answer a lot of questions. CBPO … advised Mr. Borowski that every traveler crossing the border was subject to inspection. Mr. Borowski became visibly irate and told the CBPO that he should "Go inside and ask a Supervisor. We are Trusted Travelers and the Supervisor will tell you that we are not subject to the same questions." CBPO … assured him that was not the case. Throughout the entire inspection Mr. Borowski was uncooperative and argumentative. He attempted to take control of the inspectional process. CBPO … felt that the demeanor of Mr. Borowski was not consistent with other travelers who cross

> the border and it raised enough suspicion for CBPO … to request the keys and p[er]form trunk check. Upon completion of the inspection, all were released USC's.

Appendix A, p. 33; see also Appendix A, p. 32.

**May 2022: Borowski Filed his NEXUS Renewal Application**

Borowski applied to renew his NEXUS membership on May 26, 2022. Dkt. # 9, ¶ 26.

**December 20, 2022: CBP Revoked Borowski's NEXUS Pass**

By letters dated December 20, 2022, CBP revoked Borowski's NEXUS membership and denied the renewal of his membership. Appendix A, pp. 15-16; see also Appendix A, pp. 20, 72. CBP took this action because Borowski had repeatedly been "non-compliant during the inspection process. … Mr. Borowski's behavior has been argumentative and confrontational with officers at every turn." Appendix A, p. 72.; see also Appendix A, p. 20. After CBP's risk assessor determined that Borowski did not meet NEXUS program eligibility requirements because of his repeated confrontational behavior at the border, the Director "[c]oncur[ed] with vetting results" and "[d]enied" Borowski's application due to "Risk/Totality of Circumstances." Appendix A, p. 20.

On December 20, 2022,

> Client came to the EC to discuss the reasons for his denial. During the day he called the office 2 times. The first call the officer advised him to file a request for reconsideration with the OMBUDSMAN through his trusted traveler account. On the second call the officer he spoke with was unaware he had phoned earlier and told him if he came to the EC he might get more information. He arrived at the EC at closing time and was mildly confrontational. He stated the CBP website said he should file a FOIA request at the EC. He stated he was an attorney and was "serving" us (CBP officers present) with a FOIA request. He was advised that he should know it is improper to "serve" papers in the manner in which he was attempting. He was also advised that the EC and CBP do not process the FOIA request and he needs to submit to the proper place. He was also advised again

> the proper place to request for reconsideration is through the OMBUDSMAN.

Appendix A, p. 69.

On December 21, 2022,

> Subject came into the Buffalo EC on December 21, 2022 at approximately 6:30 p.m. to inquire about his recent NEXUS renewal denial. Subject provided documentation stating his application was denied and that he does not meet program eligibility requirements at this time. Subject was asked about any previous NEXUS revocations. Subject was also asked about past incidents in/around the border. In response to those questions, subject stated officers were "abrasive" and that there was one officer in particular with whom he has had negative interactions (an officer he stated he sued). Subject stated he spoke to a supervisor about an agriculture violation in 2018. Subject stated the supervisor told him that agriculture officer "does this to everyone" and that the subject shouldn't worry about the incident. Subject was then asked if at any point he may have reacted to any encounter in a way that could have been handled in a more appropriate manner. Subject said no. Subject was very quick to point to the mistakes of others while painting himself in a very positive light, and specifically as the "victim" in his latest NEXUS denial. Subject mentioned he will have to spend much money litigating with CBP in an attempt to get his NEXUS card privileges re-instated (all because he states he is disliked by a certain officer and that that officer is out to get him). Subject was … about local WCs and Chiefs with whom he could speak. Subject was advised that the reconsideration request, which he already filed, is the means of reviewing unfavorable decisions to program status. After the discussion ended, the subject went back to the secondary inspection area of the bridge to inquire further.

Appendix A, p. 69.

**April 2023: Another Confrontational Incident at the Border**

On April 5, 2023,

> at approximately 1157 hours, subject Matthew Karim BOROWSKI … was encountered in lane seven at the Peace Bridge Port of Entry, Buffalo, New York. During the primary examination, the subject indicated to the Primary Officer that his citizenship was irrelevant. Furthermore, the subject indicated

that he would only state that he has nothing to declare. At that time, the Primary Officer called for an escort. Responding officers requested that the subject step out of the vehicle, and attempted to clarify if he possessed any weapons on his person or in the vehicle. The subject replied by stating what is a weapon? At that time, the subject was escorted into the CBP Secondary Administrative Building for further examination. During the escort, the subject expressed that he does not want anyone to touch or move his vehicle. Once in secondary, the subject was placed in the medium-secondary area until his vehicle could be searched for contraband, merchandise, or weapons. The subject's vehicle was cleared from the primary lane in order to process other travelers. The vehicle was driven to the secondary parking lot by a CBP Officer and was witnessed by the on-duty Supervisory CBP Officer. … Upon conclusion of the … examination, the subject was removed from the medium-secondary lobby and placed in the general lobby. The subject's passport and vehicle keys were returned to him. At approximately 1215 hours, the subject was advised that CBP's secondary examination was completed, and he was clear to leave. BOROWSKI requested to speak to the Watch Commander. The on-duty Supervisor immediately contacted the on-duty Watch Commander regarding the subject's request. At that time, WC … responded to secondary and spoke with the subject regarding his concerns, as well as CBP procedures. After speaking with WC … the subject departed the Port of Entry at approximately 1230 hours.

WC Notes: Mr. Borowski stated he will not answer questions he felt that a USC does not need to answer such as Where are you going? He claims that the officer does not need to know where in the US he is going. I spoke to Mr. Borowski and advised him that if he does not answer the officer's questions, he may be sent or escorted to secondary and that the officers questions provide the officer with information to make a admit/refer decision. Mr. Borowski stated he will not answer those questions as he is not bound by the NEXUS program as his card was revoked. He stated he inquired with a FOIA request and as SCBPO … but has not received an answer as to why his card was revoked. All officers were professional during this encounter. Mr. Borowski requested the names of the primary officer, the officer that drove his car and wanted to speak to Officer … (K9 Supervisor). I provided Mr. Borowski with my name and advised him that he could file a complaint or a FOIA request regarding the inspection. Mr. Borowski departed the station at approximately 1230 hours.

Appendix A, p. 9, see also Appendix A, pp. 8, 10-14.

**April 2023: CBP Ombudsman Denied Reconsideration of Revocation**

On April 12, 2023, the CBP Ombudsman denied Borowski's request for reconsideration. Appendix A, p. 4. The CBP Ombudsman denied the reconsideration request because:

> Supervisory Ombudsman: Sustained denial revocation based on the totality of noncompliance with the inspection process on numerous occasions. Applicant has 6 positive relevant [incidents] (3 in 2013, 1 in 2014, 1 in 2016, and the latest in 2023) from inspections where the applicant's behavior is confrontational and/or his actions interfere with the inspection process. Applicant was previously revoked for noncompliance in 2013 and Ombudsman granted discretion in April 2014 and gave applicant another opportunity for TTP enrollment, but specifically stated to the Enrollment Center to please warn applicant against future noncompliance during both outbound or inbound inspections. Applicant likely should have been revoked for repeat noncompliance as noted in November 2014 … or May 2016 …. Applicant has numerous crossings and 53 total secondary inspections. Applicant's April 2023 [incident] details alone are enough to warrant a sustained denial revocation based on statements of intended noncompliance the applicant made to the Watch Commander after the secondary inspection was complete. Port and EC can remind the applicant that those who do not qualify for Trusted Traveler Program participation are not prohibited from entering the United States. However, they are not permitted to use a Trusted Traveler dedicated lane to do so. Does not warrant discretion at this time.

Appendix A, p. 68, 5-6.

**Plaintiff's April 2023 New Application to the NEXUS Program**

Borowski submitted a new application to the NEXUS program on April 12, 2023 – the same day that CBP's Ombudsman affirmed the denial of his reconsideration request. Dkt. # 86-1, ¶ 19.

**March 2025: CBP Denied Borowski's New NEXUS Application Because of His Long History of Confrontational Behavior at the Border as well as Because of Two Additional Incidents in 2023**

After conducting a risk assessment, CBP denied this application on March 26, 2025 as it was determined that Borowski did not meet the program eligibility requirements. Dkt. # 86-1, ¶ 20, Exhibit 9. In connection with the risk assessment, CBP took into consideration the aforementioned encounters with Borowski, as well as the following encounters:

> • On June 8, 2023, during primary inspection, the CBP Officer asked Borowski what was the purpose of his travel. Borowski responded by stating that he is American and did not need to answer any of the inspecting Officer's questions. The inspecting CBP Officer referred Borowski to secondary inspection, and as the Officer was explaining how to proceed to the secondary inspection area, Borowski began to drive away. The inspecting Officer started shouting at Borowski that the CBP Officer in secondary needs to indicate that it is okay to proceed to the secondary inspection area, so the Officer can stop any tractor trailers for his safety. In response, Borowski shouted in a hostile tone that he knows how to drive and doesn't need to be instructed. At this time, Borowski was ordered to stop his vehicle, turn it off, and hand over his vehicle keys. Borowski refused to do so. Officer assistance was requested. Several Officers arrived at the inspection lane and ordered Borowski out of his vehicle, but Borowski still refused to comply. At this point, the vehicle door was opened, and Borowski eventually removed his seat belt. Hold was taken of Borowski's arm and he was removed from the vehicle. Borowski was then asked to stand with his arms out in front of him so the Officers could conduct a pat down for officer safety. Initially, Borowski complied, but he then twisted away from the Officers, stating that they were to get their hands off of him. Borowski was then handcuffed and escorted to secondary inspection for further inspection.
>
> • On August 1, 2023, Borowski presented himself for admission into the United States, but refused to answer routine inspection questions at primary inspection. Borowski complained to the inspecting Officer that a forty-minute wait to enter the United States was too long, and Borowski stated that he was an immigration lawyer, and could ask whatever questions

> he wanted of the inspecting Officer. After his primary inspection was completed and he was released as a U.S. citizen, Borowski instead voluntarily drove to the secondary areas and sought out a supervisor to complain about the forty-minute wait and claimed that CBP illegally confiscated his NEXUS pass.

Dkt. # 86-1, ¶ 20, Exhibits 10-11. CBP's decision to deny Borowski's new application was relayed to Borowski via a letter dated March 25, 2025, and it also advised him that if he believed that the decision was based on incomplete or inaccurate information, he may request reconsideration. Dkt. # 86-1, ¶ 21, Exhibit 9. To date, Borowski has not sought reconsideration of the Agency's March 26, 2025 decision to deny his new application. Dkt. # 86-1, ¶ 22.

## PROCEDURAL HISTORY

Borowski commenced this action on March 22, 2023. Dkt. # 1. He filed an amended complaint on June 20, 2023. Dkt. # 9. In his amended complaint, Borowski asserts a claim under the APA alleging that CBP's decision to deny his 2022 NEXUS renewal application was "arbitrary and capricious and/or in violation of the law, as a retaliatory measure taken by CBP." Dkt. # 9, ¶ 79. Borowski also alleges a claim under the Freedom of Information Act ("FOIA") arising out of his December 22, 2022 FOIA request. Dkt. # 9, ¶¶ 80-83. Additionally, Borowski asserted claims for false arrest, false imprisonment, assault and battery, unlawful seizure, intentional infliction of emotional distress, and claims under the First, Fourth, and Fifth Amendments to the U.S. Constitution. Dkt. # 9, ¶¶ 84-100.

On July 21, 2023, CBP moved to dismiss the amended complaint. Dkt. # 13. On February 21, 2024, the Court (Wolford, C.J.): (i) sustained the APA claim holding that CBP's "published factors listed in the Federal Register Notice and on the NEXUS eligibility website provide law to apply and meaningful standards against which to judge the agency's exercise

of discretion," Dkt. # 29, p. 18; (ii) dismissed Borowski's FTCA claims for failure to exhaust administrative remedies, Dkt. # 29, p. 20; and (iii) dismissed Borowski's constitutional claims as CBP may not be held liable on Bivens theories, Dkt. # 29, p. 21. Thus, following Chief Judge Wolford's February 21, 2024 Decision and Order, only Borowski's APA and FOIA claims remained in the case.

On October 16, 2023, CBP moved for summary judgment on the FOIA claim. Dkt. # 19. On May 10, 2024, the Court denied CBP's motion without prejudice. Dkt. # 37.

On July 9, 2024, CBP renewed its summary judgment motion on the FOIA claim in order to address the deficiencies cited by the Court in its May 10, 2024 Decision and Order. Dkt. # 44. On March 20, 2025, the Court issued its Decision and Order on CBP's second motion for summary judgment on the FOIA claim. Dkt. # 65. The Court granted CBP's summary judgment motion with respect to FOIA Exemptions 6 and 7(C) but denied the motion with respect to FOIA Exemptions 5 and 7(E). Dkt. # 65, p. 35.

This Decision and Order also addressed Borowski's motions concerning his APA claim: his motion to expand the administrative record because "he argues that Defendant did not produce all the documents and information that was considered when Defendant denied his NEXUS application," Dkt. # 65, p. 4, and his motion arguing that documents in the administrative record should be unredacted. Id. The Court denied Borowski's motion to expand the administrative record. Dkt. # 65, pp. 7-9. With regard to redactions in the administrative record, the Court held that CBP established that certain documents were properly redacted on the basis of the deliberative process privilege. Dkt. # 64, pp. 10-11. The Court, however, held that CBP failed to prove that the law enforcement privilege applies and that "Defendant must either produce additional information establishing that the law

enforcement privilege is properly asserted for the redacted content in the Amended Administrative Record or produce these records in an unredacted format." Dkt. # 65, pp. 12-13. The Court also held that CBP did not show why personally identifiable information should be redacted from the administrative record and concluded that "[a]bsent an agreement from the parties, the Defendant must produce the Amended Administrative Record with the personal identifying information or seek a protective order for such information." Dkt. # 65, pp. 13-14.

In a July 25, 2025 Text Order, the Court directed that (1) CBP may file a motion to dismiss the APA claim on or before September 25, 2025; (2) regarding the FOIA claim, CBP may submit to this Court for *in camera* review, on or before August 25, 2025, the five pages of intra-agency emails withheld pursuant to Exemption 5 and a supplemental declaration explaining the harm that would result from the production of these records; (3) on or before September 25, 2025, CBP may submit supplemental information detailing whether Exemption 7(E) was properly applied to the withheld material; and (4) any response to the supplemental submission from Borowski is due by October 16, 2025. Dkt. # 79.

CBP submitted the requested materials to the Court on August 25, 2025 for *in camera* review. On September 4, 2025, the Court extended the time for CBP to make the motion to dismiss the APA claim to October 17, 2025. Dkt. # 81. CBP filed its supplemental summary judgment motion concerning FOIA Exemption 7(E) on September 25, 2025. Dkt. # 82. The Court extended the time for CBP to make the motion to dismiss the APA claim to October 24, 2025. Dkt. # 84. CBP filed its motion to dismiss the APA claim on the grounds of mootness on October 24, 2025. Dkt. # 86.

The Court, in its July 13, 2026 Decision and Order, granted summary judgment to CBP on the FOIA claim but denied CBP's motion to dismiss the APA claim. Dkt. # 94. Thus, the sole remaining claim is Plaintiff's APA claim under § 706(2)(A).

On July 27, 2026, the Court issued a Text Order and required the parties to file a joint status report regarding the following three questions: (i) whether the parties agree that the remaining claim will be tried as a bench trial; (ii) how long the parties anticipate the trial will last; and (iii) given the Court's congested calendar, whether the parties consent to try the remaining claim before a magistrate judge. Dkt. # 95.

On August 28, 2026, the parties filed their status report. Dkt. # 98. In the status report, the parties indicated that they disagreed about whether a trial should be held on the APA claim and requested the opportunity to brief the Court on the issue. Dkt. # 98. Borowski filed his brief on this issue on September 11, 2026. Dkt. # 99.

## ARGUMENT

## POINT I

## THE APA CLAIM SHOULD BE RESOLVED BY WAY OF MOTION PRACTICE

"Section 706(2) of the APA gives a reviewing court authority to 'hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Farm Sanctuary v. United States Dep't of Agric., 664 F. Supp. 3d 334, 363 (W.D.N.Y. 2023) (Wolford, C.J.) (quoting 5 U.S.C. § 706(2)(A)). "In an APA case, the court relies on the administrative record for the material facts to determine if the agency's decision exceeds the agency's statutory authority or is arbitrary and capricious or an abuse of discretion." Farm Sanctuary, 664 F. Supp. 3d at 347–48 (citations and internal quotation marks omitted). "In reviewing an APA claim, the Court's

task is not to engage in an independent evaluation of the cold record, nor to substitute its judgment for that of the agency. Instead, it is for the Court to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action." Id. at 364 (citations and internal quotation marks omitted). "The standard of review under 5 U.S.C. § 706(2)(A) is highly deferential and presumes the agency's action to be valid." Id. at 363 (citations and internal quotation marks omitted).

In conducting this review of agency action, a district court is "limited to examining the administrative record." Kakar v. United States Citizenship & Immigr. Servs., 29 F.4th 129, 132 (2d Cir. 2022) (citations and internal quotation marks omitted). Accordingly, a district court's role in reviewing agency action under APA § 706(2)(A) is akin to that of an appellate court. Ass'n of Proprietary Colleges v. Duncan, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015) (in reviewing "agency action under the APA, the district judge sits as an appellate tribunal," and "the entire case on review is a question of law.") (citations and internal quotation marks omitted). A trial with witnesses would not be appropriate because "district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues." Ass'n of Proprietary Colleges, 107 F. Supp. 3d at 344 (citations and internal quotation marks omitted). Therefore, the appropriate way to conclude the litigation of Borowski's APA claim is for the parties to bring motions for judgment based on the administrative record. Id. at 344 (holding that, in an APA case, "summary judgment … is generally appropriate, as the question whether an agency's decision is arbitrary and capricious ... is a legal issue amenable to summary disposition.") (citations and internal quotation marks omitted); Noroozi v. Napolitano, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (same) (collecting

cases); Citizens Against Casino Gambling in Erie Cnty. v. Hogen, No. 07-CV-0451S, 2008 WL 2746566, at *25 (W.D.N.Y. July 8, 2008) ("Plaintiffs' claims that Defendants acted in an arbitrary and capricious manner, or made determinations that are contrary to law, are legal questions that can be resolved on review of the agency record and/or the governing statutes, regardless of whether the questions are presented in the context of a motion to dismiss or in a motion for summary judgment."); Pellicano v. Off. of Pers. Mgmt., No. 3:11-CV-405, 2012 WL 4103891, at *2 (M.D. Pa. Sept. 18, 2012) (requiring parties in an APA case to "file cross-motions for judgment on the administrative record.").

Borowski argues that, while APA claims are normally resolved based on the administrative record, this "rule is not absolute." Dkt. # 100, p. 1. He asserts that "[e]xtra-record inquiry, including testimony, may be appropriate where the administrative record is inadequate to permit effective judicial review, where formal findings are absent, or where there is a strong showing of bad faith or improper conduct." Id. (citing National Audubon Soc'y v. Hoffman, 132 F.3d 7, 14–15 (2d Cir. 1997)[2]; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977)).

---

[2] Borowski's reliance on National Audubon Society is unavailing as that case was decided under the National Environmental Policy Act ("NEPA"), and not the APA. Id. at 10. And, while NEPA and the APA both provide for judicial review of agency action under an arbitrary and capricious standard, "[d]eviation from this 'record rule' occurs with more frequency in the review of agency NEPA decisions than in the review of other agency decisions" because "NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record." Id. at 14-15. Accordingly, National Audubon Society is inapposite. Notably, Suffolk Cnty. v. Sec'y of Interior, 562 F.2d 1368, 1383 (2d Cir. 1977), also relied upon by Borowski, was similarly litigated under NEPA.

Citizens concerned the proposed construction of a highway through Overton Park in Memphis, Tennessee. Id. at 406. The Federal-Aid Highway Act of 1968 prohibited "the use of federal funds to finance the construction of highways through public parks if a 'feasible and prudent' alternative route exists." Id. at 405. "If no such route is available, the statutes allow … construction through parks only if there has been 'all possible planning to minimize harm' to the park." Id. (citations omitted). Plaintiff sued under the APA to stop construction of the highway alleging that the Secretary of Transportation, in his decision approving construction, failed to make any factual findings indicating "why he believed there were no feasible and prudent alternative routes or why design changes could not be made to reduce the harm to the park." Id. at 408. The Court remanded to the district court for review "based on the full administrative record that was before the Secretary at the time he made his decision." Id. at 420. The Court held that

> since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.
>
> The court may require the administrative officials who participated in the decision to give testimony explaining their action. Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided. *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004—1005, 85 L.Ed. 1429 (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in *Morgan*, there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.

Id. at 420. Thus, in Citizens, the Court set forth a very narrow rule for when it is appropriate to go outside the administrative record to decide an APA case. Testimony may be taken only if the administrative record fails to "disclose the factors that were considered" in making the agency's decision. Id. And, where the administrative record contains "findings that were made at the same time as the decision, … there must be a strong showing of bad faith or improper behavior before such inquiry may be made." Id.

In arguing that a trial should be held under the rule articulated in Citizens, Borowski asserts that "[t]he existing record does not conclusively establish CBP's actual contemporaneous reasons for revoking Plaintiff's NEXUS membership." Dkt. # 100, p. 1. This is incorrect.

Borowski applied to renew his NEXUS membership on May 26, 2022. Dkt. # 9, ¶ 26. CBP revoked Borowski's NEXUS pass on December 20, 2022. Appendix A, pp. 15-16. On December 12, 2022, eight days before rendering its decision, CBP completed a Risk Assessment Worksheet. Appendix A, pp. 19-20. As part of that risk assessment, CBP listed the numerous incidents described in detail above where Borowski was argumentative, confrontational, and unwilling to submit to inspection by CBP officers at the border. Appendix A, pp. 19-22. The Risk Assessment also described how Borowski's NEXUS pass was revoked in 2013 after the December 14, 2013 incident which followed on the heels of the March 19 and April 18, 2013 incidents. Appendix A, p. 20. The Risk Assessment emphasized that Borowski "has been argumentative and consistently fails to comply with officer's direction." Appendix A, p. 20. The Director reviewed the Risk Assessment and "[c]oncur[ed] with vetting results" and held that Borowski's renewal application was "Denied-Risk/Totality of Circumstances." Appendix A, pp. 20-21. After Borowski requested reconsideration by the

CBP Ombudsman, the reconsideration request was rejected on April 12, 2023. Appendix A, p. 4. The Supervisory Ombudsman who rejected the reconsideration request provided a contemporaneous justification for the decision on April 12, 2023:

> Supervisory Ombudsman: Sustained denial revocation based on the totality of noncompliance with the inspection process on numerous occasions. Applicant has 6 positive relevant [incidents] (3 in 2013, 1 in 2014, 1 in 2016, and the latest in 2023) from inspections where the applicant's behavior is confrontational and/or his actions interfere with the inspection process. Applicant was previously revoked for noncompliance in 2013 and Ombudsman granted discretion in April 2014 and gave applicant another opportunity for TTP enrollment, but specifically stated to the Enrollment Center to please warn applicant against future noncompliance during both outbound or inbound inspections. Applicant likely should have been revoked for repeat noncompliance as noted in November 2014 … or May 2016 …. Applicant has numerous crossings and 53 total secondary inspections. Applicant's April 2023 [incident] details alone are enough to warrant a sustained denial revocation based on statements of intended noncompliance the applicant made to the Watch Commander after the secondary inspection was complete. Port and EC can remind the applicant that those who do not qualify for Trusted Traveler Program participation are not prohibited from entering the United States. However, they are not permitted to use a Trusted Traveler dedicated lane to do so. Does not warrant discretion at this time.

Appendix A, p. 68, 5-6. Thus, this is not a case where the administrative record lacks any explanation for administrative action. On the contrary, the administrative record clearly records Borowski's pattern of misbehavior and the justifications for CBP's actions. This is also not a case where the administrative action was supported by post-hoc rationalizations. Rather, the administrative record contains contemporaneous explanations for why CBP took the actions it did. Accordingly, Citizens' narrow rule does not apply here because CBP clearly "disclose[d] the factors that were considered" in making its decisions. Moreover, Borowski has failed to make any showing, let alone a "strong showing," that CBP engaged in "bad faith

or improper behavior" that would permit the Court to inquire beyond the administrative record. See Ali v. Pompeo, 16-CV-3691, 2018 WL 2058152, at *5 (E.D.N.Y. May 2, 2018) ("Allegations of bad faith must be based on hard facts.... Evidence, and not merely counsel's argument, must support the showing.") (citations and internal quotation marks omitted). Therefore, the Court should hold that Borowski's APA claim will be resolved by dispositive motion practice.

**POINT II**

**THE COURT SHOULD PERMIT CBP TO FILE A MOTION AND/OR A PROTECTIVE ORDER WITH RESPECT TO REDACTIONS CONTAINED IN THE ADMINISTRATIVE RECORD**

As stated above, CBP filed an Amended Administrative Record on July 18, 2024. Dkt. # 45. However, the Court held, in its March 20, 2025 Decision and Order, that (i) CBP had not met its burden to show that portions of the Amended Administrative Record should be redacted under the law enforcement privilege; (ii) CBP "must either produce additional information establishing that the law enforcement privilege is properly asserted for the redacted content in the Amended Administrative Record or produce these records in an unredacted format"; and (iii) CBP "must produce the Amended Administrative Record with the personal identifying information or seek a protective order for such information." Dkt. # 65, pp. 11-14. Therefore, CBP respectfully requests an opportunity to file (i) a motion providing additional information establishing that the law enforcement privilege is properly asserted for the redacted content in the Amended Administrative Record; and (ii) a proposed protective order concerning personally identifying information.

## CONCLUSION

For the foregoing reasons, the Court should (i) find that the APA claim should be resolved by way of motion practice; and (ii) permit CBP to file papers concerning the amended administrative record.

DATED: Buffalo, New York, September 22, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY: s/MICHAEL S. CERRONE
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5851
michael.cerrone@usdoj.gov